PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1242
_____

UNITED STATES OF AMERICA

v.

MIGUEL EDUARDO ROSARIO
also known as Deuce,

Appellant

_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal Action No. 3:21-cr-00206-001)
District Judge: Honorable Robert D. Mariani

_____

Argued on November 3, 2025

Before: PHIPPS, ROTH and RENDELL, Circuit Judges

(Opinion filed: July 1, 2026)

Jason F Ullman                    **(ARGUED)**
Office of Federal Public Defender
100 Chestnut Street
Suite 306
Harrisburg, PA 17101

Counsel for Appellant

Christian T. Haugsby              **(ARGUED)**
Office of United States Attorney
Middle District of Pennsylvania
Sylvia H. Rambo United States Courthouse
1501 N 6th Street, 2nd Floor
P.O. Box 202
Harrisburg, PA 17102

Counsel for Appellee

_____

OPINION

_____

ROTH, *Circuit Judge.*

A jury convicted Miguel Rosario for drug offenses, which resulted in the serious bodily injury and death of Nicholas Correa, and for accepting an assault rifle and a shotgun as payment for drugs from another customer. Rosario now challenges the constitutionality of the search warrant used to seize and search his Facebook communications, the sufficiency of evidence presented during trial, his conviction for possessing firearms in furtherance of drug trafficking, the

District Court's evidentiary rulings, and the District Court's imposition of a statutorily mandated life sentence.

For the following reasons, we will affirm Rosario's convictions. However, we will vacate his sentence and remand to the District Court for resentencing.

## I.    BACKGROUND

Around midnight on March 24, 2019, Rosario, a parolee with prior convictions for heroin and cocaine distribution,[1] sold drugs to Correa in the parking lot of a Wawa gas station in Hamburg, Pennsylvania. Later that morning, Correa's girlfriend found Correa dead in his car while parked in his mother's driveway in the Poconos and called 911. Toxicology reports later confirmed the presence of fentanyl-laced heroin and cocaine in Correa's system. A postmortem review of Correa's cell phone and GPS history revealed he had driven over an hour from his mother's house in the Poconos to the Wawa gas station after coordinating a drug transaction with a "Deuce Rosario" by text message and Facebook Messenger.

In April 2019, state law enforcement, led by Trooper Jonathan Bailey, launched an investigation into Correa's death. During that investigation, Rosario admitted that he had supplied Correa with cocaine on the night of Correa's death and on previous occasions.[2] With this information, Trooper

---

[1] In 2007, the Berks County Court of Common Pleas convicted Rosario for manufacture, delivery, or possession with intent to manufacture or deliver cocaine. In 2014, the same court convicted Rosario for the same offense involving heroin.

[2] Rosario denied ever selling heroin to Correa.

Bailey sought a warrant to search Rosario's Facebook records; he received authorization from a Pennsylvania state judge to obtain the following:

> Any and all text messages/posts, photos, video/audio messages, and phone calls made to/from Miguel ROSARIO and Nicholas CORREA through the Facebook, Inc. accounts of https://www.facebook.com/deuce.dr212, https://facebook.com/Rdgpapi, https://wwwfacebook.com/nick.correa.96 between 12/01/18 to [June 27, 2019] related to this death investigation. The associated IP addresses that were utilized to post these messages, posts, photos, and video/audio messages on the above listed accounts.[3]

The warrant application included a probable cause affidavit, in which Trooper Bailey specified the known facts surrounding Correa's death, including that Correa's cell phone contained Facebook messages exchanged with an account called "Deuce Rosario;" Wawa security camera footage showed Rosario and Correa meeting and sitting in Correa's car; and, after Correa's death, Rosario deleted his Facebook account and activated another account, leading police to believe that Rosario was still "conducting drug transactions through this updated Facebook account."[4]

In response to the warrant, Facebook produced over 1,000 files and approximately 2,700 pages of communications,

---

[3] Appx. 213.
[4] Appx. 75, 215.

although only 90 of those pages included communications between Rosario and Correa. The records also contained correspondence between Rosario and third-party drug customers, which law enforcement relied on to identify trial witnesses, who later testified that they either purchased drugs from Rosario or assisted with his drug distribution. The records revealed that in September 2018, Correa crashed his car after overdosing on drugs he had bought from Rosario; also in June 2019, Rosario traded 1.5 ounces of methamphetamine for an assault-style rifle with another customer, Joshua Stevens, who arranged for hand-delivery by a middleman.

On July 27, 2021, a federal grand jury indicted Rosario on five counts: conspiracy to possess with the intent to distribute narcotics, resulting in death and serious bodily injury, in violation of 21 U.S.C. § 846 (Count 1); possession with the intent to distribute heroin and methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Counts 2 and 3); possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A) (Count 4); and conspiracy to possess a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(o) (Count 5). The jury convicted him on all counts.

Before trial, Rosario moved to suppress the Facebook evidence, arguing that the search warrant violated the Fourth Amendment because it was overbroad and lacked particularity. He also moved for a hearing pursuant to *Franks v. Delaware*[5] based on his belief that Trooper Bailey's affidavit misidentified Facebook as the source of quoted communications between Rosario and Correa and intentionally

---

[5] 438 U.S. 154 (1978).

omitted that those communications originated from cell phone text messages. Finding no deficiencies with the warrant nor any reckless or grossly negligent conduct by Trooper Bailey, the District Court denied both the motion to suppress and the *Franks* hearing request.

The District Court sentenced Rosario pursuant to 21 U.S.C. § 841(b)(1)(C), which mandates a life sentence when a defendant with a prior felony drug offense conviction is later convicted of distributing drugs that result in death or serious bodily injury.[6] Rosario appeals his judgments of conviction and sentence.

## II. DISCUSSION[7]

### A. Fourth Amendment Search and Seizure

The Fourth Amendment requires that a search warrant be supported by probable cause and that it "particularly describ[e] the place to be searched, and the persons or things to be seized."[8] Probable cause exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place."[9] However, even where law enforcement has seized evidence in a search that violated an individual's Fourth Amendment rights, suppression of that

---

[6] 21 U.S.C. § 841(b)(1)(C).

[7] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

[8] U.S. Const. amend IV.

[9] *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

evidence is not a guaranteed consequence.[10]  Indeed, "there is no constitutional right to have the evidentiary fruits of an illegal search or seizure suppressed at trial."[11]  Suppression "has always been our last resort, not our first impulse."[12]

Recognizing this principle, the Supreme Court in *United States v. Leon* established the "good faith exception" to the exclusionary rule:  The exception provides that the exclusionary rule will not necessarily apply to evidence obtained through an illegal search or seizure.[13]  The rule will only apply in those "unusual cases" where there is a need to appreciably deter governmental violations of the Fourth Amendment.[14]

### 1.  *Franks* **Hearing**[15]

The first of Rosario's challenges to his drug convictions is that Trooper Bailey both misstated and omitted relevant information in the probable cause affidavit.  Based on this, he contends that the District Court should have granted him an

---

[10] *United States v. Caesar*, 2 F.4th 160, 167 (3d Cir. 2021).

[11] *United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014).

[12] *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

[13] 468 U.S. 897, 922 (1984).

[14] *Katzin*, 769 F.3d at 170 (quoting *Leon*, 468 U.S. at 918).

[15] We review for clear error a district court's determination regarding whether false statements in a warrant application were made with reckless disregard for the truth.  *United States v. Desu*, 23 F.4th 224, 235 (3d Cir. 2022).  Then, "after putting aside any false statements made with reckless disregard for the truth, we review de novo a district court's substantial-basis review of a magistrate judge's probable cause determination."  *Id.*

evidentiary hearing, pursuant to *Franks v. Delaware*,[16] to support his motion to suppress.

A *Franks* hearing allows a defendant to challenge facts contained in or omitted from a probable cause affidavit after he (1) makes a "substantial preliminary showing" that the affiant knowingly and intentionally, or with reckless disregard for the truth, omitted information or included false statements in the affidavit, and (2) demonstrates that those falsities or omissions were material to a probable cause finding.[17] An officer acted with "reckless disregard" for the truth when the officer "actually entertained serious doubts[,] or obvious reasons existed" for him to doubt the omission of relevant information from the affidavit.[18] If, at the suppression hearing, the defendant has established intentionality and materiality by a preponderance of the evidence, the motion to suppress should be granted.

Rosario contends that Trooper Bailey recklessly disregarded the truth by representing to the state judge who issued the warrant that Wawa surveillance footage showed a hand-to-hand transaction during Rosario's meeting with Correa. In support, Rosario cites Trooper Bailey's testimony from the suppression hearing, where the Trooper stated that he did not observe any hand-to-hand exchange.

Rosario's assertion misses the mark. We discern no clear error from the District Court's factual findings,

---

[16] 438 U.S. 154 (1978).
[17] *United States v. Yusuf*, 461 F.3d 374, 383–84 (3d Cir. 2006).
[18] *United States v. Brown*, 631 F.3d 638, 645 (3d Cir. 2011) (cleaned up).

8

particularly its conclusions that Wawa surveillance footage supported Trooper Bailey's observation of a hand-to-hand transaction, and that the hearing testimony referred to a separate interaction that took place before the exchange described in the affidavit.

Rosario further contends that Trooper Bailey misinformed the court when referring in the affidavit to his and Correa's communications. He argues that Trooper Bailey misidentified Facebook as the source of his cell phone messages and misquoted the contents of said messages. Yet, here too, we are satisfied with the District Court's conclusion that Rosario failed to substantially show that the affidavit's alleged misquotes and omissions bore any materiality to the state judge's probable cause assessment. Rosario's argument hinges on the notion that Trooper Bailey by no means could have viewed the messages described in the affidavit through Facebook Messenger, but the District Court correctly noted that such a conclusion rests on multiple unproven technological assumptions about Correa's Facebook user settings.

The medium through which Trooper Bailey viewed the communications—whether Facebook Messenger or cell phone text messages—does nothing to advance Rosario's assertion that Trooper Bailey fabricated or misrepresented the

messages.[19]  Nor does it vitiate the undisputed fact that Rosario and Correa used Facebook to communicate about drugs long before and leading up to Correa's death.

Though we recognize that *Franks* allows multiple avenues by which Rosario could have satisfied his burden of "substantial[ly] . . . showing" the affidavit's falsehood and materiality,[20] each one demands far more than pointing to speculative technological distinctions.  The District Court therefore properly denied Rosario's request for a *Franks* hearing.

## 2. The Good Faith Exception[21]

---

[19] For example, the affidavit notes Trooper Bailey observed communications where, prior to the relevant drug transaction, Correa stated:  "[D]o you have that jaunt?" and "I got cash on me."  Appx. 214.  The record reveals that Correa indeed sent nearly identical messages:  "I need those jawns" and "[c]ash in hand bro."  Appx. 155.  We have no indication from Rosario or otherwise that these text messages did not appear in Correa's Facebook Messenger application.  Rather, we are aware—as was the District Court—that at the time, Facebook users could enable a feature allowing cell phone texts to appear in Facebook Messenger.  Josh Constine, *To Beat SMS, Facebook Messenger Eats SMS*, TechCrunch (June 14, 2016), https://techcrunch.com/2016/06/14/facebook-messenger-texting/.

[20] *Franks*, 438 U.S. at 171.

[21] When reviewing a district's court order on a motion to suppress, we review factual determinations for clear error and legal determinations de novo.  *United States v. Wright*, 777 F.3d 635, 638 n.1 (3d Cir. 2015).

10

Ordinarily, we would turn next to a probable cause analysis to determine the search warrant's validity under the Fourth Amendment.[22]  However, we need not do so because regardless of any conclusion to be drawn from the inquiry, we

[22] *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993). Rosario also asserts that the government "waived any Good-Faith argument on the particularity error" because it raised the good faith exception only as to probable cause and overbreadth errors, and particularity is a "separate doctrinal inquiry than probable-cause and overbreadth."  Br. at 25–26.  The Government counters that its inadvertent omission of the word "particularity" from its good faith exception argument should not preclude our consideration of the issue.  We agree. *First*, Rosario's argument implicates a potentially forfeited issue, which, unlike a waived argument, we may resurrect.  *United States v. Dowdell*, 70 F.4th 134, 140 (3d Cir. 2023) (internal citation and quotations omitted).  *Second*, the government's brief before the District Court argues that Rosario "failed to meet the [ ] four circumstances" that bar the good faith exception, including when the warrant "was so facially deficient that it failed to particularize the place to be searched or the things to be seized."  Appx. 209 (citation omitted).  In any event, though we do not blindly excuse forfeitures by the government, we also recognize that "enforcing forfeiture in suppression hearings does not promote the exclusionary rule's '*sole* purpose' of deter[ring] misconduct by law enforcement." *Dowdell*, 70 F.4th at 140 (internal citations and quotations omitted).  We will therefore consider the government's argument.

find the good faith exception shields the seized Facebook evidence from suppression.[23]

In considering the good faith exception, our task is to determine whether a well-trained officer would reasonably believe the search was legal, which does not occur when there has been "deliberate, reckless, or grossly negligent conduct" or when an officer's conduct exemplifies "recurring or systemic negligence" that justifies deterrence.[24] The good faith exception is applicable except in the following circumstances:

> (1) where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
> (2) where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;
> (3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

---

[23] *United States v. Caesar*, 2 F.4th 160, 168 (3d Cir. 2021) (declining to engage in probable cause analysis where good faith exception applied to resolve the Fourth Amendment challenge); *see also United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents*, 307 F.3d 137, 145 (3d Cir. 2002) ("turn[ing] immediately to a consideration of the officers' good faith" instead of analyzing probable cause) (cleaned up)).

[24] *Herring v. United States*, 555 U.S. 135, 144 (2009).

(4) where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.[25]

Rosario relies on the first, third, and fourth circumstances to oppose an application of the good faith exception. None are applicable here.

Regarding the first circumstance, a substantial gap exists between Rosario's allegations and the evidence required to establish deliberate or reckless falsity. But even if we found that Trooper Bailey negligently drafted the warrant and affidavit, mere negligence is not the standard when assessing whether an officer deliberately violated a defendant's Fourth Amendment rights. Moreover, the Supreme Court cautions against attempting to deter incidents of "isolated negligence" by evidentiary suppression.[26]

Regarding the third circumstance, we have identified very few situations in which an affidavit is "so lacking in probable cause as to render official belief in its existence entirely unreasonable."[27] This is not one of them. To the contrary, the affidavit here was based on information from

---

[25] *United States v. Zimmerman*, 277 F.3d 426, 436–37 (3d Cir. 2002); *see also United States v. Hodge*, 246 F.3d 301, 308 (3d Cir. 2001).

[26] *Wright*, 777 F.3d at 642 (citing *Herring*, 555 U.S. at 144 n.4).

[27] These circumstances include when the affidavit: is a "bare bones" document lacking factual detail, relies on pieces of "stale evidence," or relies on an "uncorroborated or unreliable anonymous tip. *United States v. Pavulak*, 700 F.3d 651, 664 (3d Cir. 2012) (collecting cases).

Trooper Bailey's investigation, including his observation of messages between Correa and Rosario referring to drug transactions and the Wawa meeting before Correa's death. Thus, on these facts, and without deciding probable cause as to the warrant itself, it is plain to us that the officers' reliance on the affidavit was not unreasonable.

Rosario's reliance on the fourth circumstance fares no better. "Facial deficiency" requires that we "consider not only any defects in the warrant but also the officer's conduct in obtaining and executing the warrant": What did the officer know; what should he have known.[28] Thus, regardless of whether we conclude that Trooper Bailey's warrant lacked particularity, we cannot conclude that the warrant was "*so facially deficient*" as to preclude any reasonable reliance.

Our decision in *United States v. Tracey* guides our analysis.[29] There, we determined that an officer's search warrant for items bearing on the "possible exploitation of children," failed to particularize the items to be seized, and the accompanying affidavit could not cure the deficiency because the officer failed to clearly and expressly incorporate it into the warrant application.[30] Still, we found the good faith exception

---

[28] *United States v. Franz*, 772 F.3d 134, 147 (3d Cir. 2014).

[29] 597 F.3d 140 (3d Cir. 2010).

[30] *Id.* at 152–53. *Tracey* further held that courts may only construe an affidavit alongside a warrant where the warrant "expressly" incorporates the affidavit by reference. *Id.* at 147–49. Because we need not reach the probable cause inquiry here, we do not address the parties' dispute regarding whether the warrant sufficiently incorporated Trooper Bailey's affidavit.

applied because "a reasonable officer could rely on it" and noted that no evidence indicated that the officer's conduct was "deliberate, reckless, or grossly negligent" or exemplary of "recurring or systemic negligence."[31]  Nor did the defendant present such evidence.  To the contrary, we found persuasive that the officer consulted with the district attorney before submitting the warrant application, explained the search parameters to the defendant and his spouse when officers arrived to conduct the search, and then led the search team.[32]

Here, even assuming without deciding that the warrant's request for evidence "related to [Correa's] death investigation"[33] carried some degree of vagueness, Rosario's assertion that such vagueness rendered the warrant gravely deficient does not follow.  Instead, on review of the record, we find that a reasonable officer would have believed the warrant complied with the Fourth Amendment.  Like the officer in *Tracey*, Trooper Bailey consulted with a district attorney about the application and presented the package to a neutral judge, who then authorized the warrant and its scope.  Only after taking these steps did Trooper Bailey lead law enforcement's search of Rosario's Facebook records, which revealed Rosario's drug trafficking activity with Correa.

We must resist the temptation to measure an officer's understanding of the law against the specialized legal

---

[31] *Id.* at 154.

[32] *Id.* at 152–54.

[33] Appx. 213.

knowledge of attorneys and judges.[34]  This is not to suggest that we impose little expectations of legal proficiency on law enforcement officers whose duty is, after all, to enforce the law.  We do, however, echo previous decisions in which we and our sister circuits reasoned that an objectively reasonable officer would "have confidence in the validity of the warrant after presenting it and having it approved by a district attorney and the [judge], as occurred here."[35]

To be sure, "[a] police officer may not put on blinders and then claim ignorance."[36]  But that is not what happened here.  Based on the record before us, excluding incriminating Facebook evidence obtained through a challenged search

---

[34] *See Tracey*, 597 F.3d at 152 ("[I]t must . . . be remembered that the knowledge and understanding of law enforcement officers and their appreciation for constitutional intricacies are not to be judged by the standards applicable to lawyers.") (alterations in original) (quoting *United States v. Cardall*, 773 F.2d 1128, 1133 (10th Cir. 1985)).

[35] *Id.* at 153; *see also Caesar*, 2 F.4th at 170 ("[P]olice officers are not trained attorneys and generally cannot be expected to second-guess a magistrate's probable cause determination."); *Arnsberg v. United States,* 757 F.2d 971, 981 (9th Cir. 1985) (noting the Constitution does not require officers to "second-guess the legal assessments of trained lawyers"); *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991) (explaining that requiring officers to second-guess the "considered decisions" of magistrate judges would "promote delay" in executing warrants and "alter the proper allocation of law enforcement functions").

[36] *Pinkney v. Meadville, Pennsylvania*, 95 F.4th 743, 749 (3d Cir. 2024).

warrant would not deter police misconduct, particularly where the record indicates none occurred. We are left to conclude that Trooper Bailey authored and executed the warrant in objective good faith. Accordingly, we affirm the District Court's denial of Rosario's motion to suppress.

## B. Sufficiency of the Evidence

Next, Rosario challenges the trial evidence that led to his convictions. "We exercise plenary review over a district court's grant or denial of a motion for judgment of acquittal based on the sufficiency of the evidence."[37] However, we apply a "particularly deferential standard" when determining if a jury's verdict rests on sufficient evidence, because we "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence."[38] We therefore "view the evidence in the light most favorable to the prosecution and sustain the verdict unless it is clear that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[39]

### 1. Possession of a Firearm in Furtherance of Drug Trafficking

Counts 4 and 5 rest on Rosario's exchange of drugs for an assault-style rifle and a shotgun. 18 U.S.C. § 924(c)(1)(A) criminalizes "us[ing] or carr[ying] a firearm" "during and in relation to any crime of violence or drug trafficking crime," *or*

---

[37] *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir. 2009).
[38] *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010) (cleaned up).
[39] *United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010).

17

"possess[ing] a firearm" "in furtherance of" such a crime.[40] Rosario was convicted under § 924(c)(1)(A)'s second prong, which he disputes on two grounds: (1) he did not "possess" the firearms he received in exchange for drugs, and (2) assuming he "possessed" the firearms, the evidence was insufficient to support the jury's conclusion that he did so "in furtherance of" drug trafficking.[41] We disagree.

*First*, we find that Rosario "possess[ed]" the firearms when he received them as payment for methamphetamine. Rosario points to the Supreme Court's holding in *Watson v. United States* that an individual "does not 'use' a firearm under § 924(c)(1)(A) when he receives it in trade for drugs."[42] But here, Rosario elevates *Watson*'s holding from a molehill to a mountain. While *Watson* analyzed the term "use," our sole focus is on the word "*possess*," and "we do not read [these terms] interchangeably."[43] *Watson* left as an open question whether firearm possession includes guns-for-drugs trades,

---

[40] 18 U.S.C. § 924(c)(1)(A).

[41] Rosario admits the assault-style rifle served as currency for the drugs; however, he contends he "accidentally" received a shotgun in the exchange because unbeknownst to him, the shotgun was in the rifle case.

[42] 552 U.S. 74, 83 (2007).

[43] *United States v. Clark*, 115 F.4th 245, 250 (3d Cir. 2024) (emphasis added). *Compare Merriam-Webster's Collegiate Dictionary* 1301 (10th ed. 1993) ("use" means "to put into action or service"), *with id.* at 909 ("possess" means "to have and hold as property").

which we previously had "no occasion to consider."[44]  We now affirmatively answer:  a defendant who accepts a firearm in exchange for drugs both "possesses" the firearm under § 924(c) and does so "in furtherance of" drug trafficking.  Nearly all our sister circuits have confronted this issue and held the same.[45]

*Second*, even without the benefit of our holding that gun-for-drug trades are per se violations of § 924(c), the

---

[44] *Holland v. Warden Canaan USP*, 998 F.3d 70, 76 (3d Cir. 2021).  In *Holland*, the defendant received a gun in exchange for drugs; however, we declined to consider whether this constituted "possession" under § 924(c) because the relevant conviction centered on the defendant's *use* of the gun rather than his possession.  *Id.*  We accordingly held that it was "more likely than not that no reasonable juror would have convicted [the defendant] of possessing a gun in violation of § 924(c)." *Id.*

[45] *See id.* (recognizing that "[s]ome of our sister circuits have held or assumed that a defendant possesses a gun under § 924(c) the moment that he accepts it in exchange for drugs."); *see also United States v. Gurka*, 605 F.3d 40, 45 (1st Cir. 2010); *United States v. Gardner*, 602 F.3d 97, 103 (2d Cir. 2010); *United States v. Robinson*, 627 F.3d 941, 955 (4th Cir. 2010); *United States v. Sterling*, 555 F.3d 452, 458 (5th Cir. 2009) (assuming without deciding that a guns-for-drugs trade constitutes "possession in furtherance" of a drug trafficking offense); *United States v. Frederick*, 406 F.3d 754, 764 (6th Cir. 2005); *United States v. Doody*, 600 F.3d 752, 755–56 (7th Cir. 2010); *United States v. Mahan*, 586 F.3d 1185, 1188–89 (9th Cir. 2009); *United States v. Luke-Sanchez*, 483 F.3d 703, 706 (10th Cir. 2007); *United States v. Miranda*, 666 F.3d 1280, 1283–84 (11th Cir. 2012).

government presented ample evidence to support the jury's determination that Rosario's firearm possession occurred "in furtherance of" his drug trafficking crimes. We examine "the totality of the evidence, both direct and circumstantial" in determining whether the government presented evidence "specific to the particular defendant, showing that his or her possession actually furthered the drug trafficking offense."[46] As guidance, we look to nonexclusive factors set forth in *United States v. Sparrow*:

> the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and

---

[46] *United States v. Walker*, 657 F.3d 160, 172 (3d Cir. 2011).

circumstances under which the gun is found.[47]

We need not search far in the record to see that the *Sparrow* factors weigh in favor of affirming Rosario's conviction. Rosario accepted an assault-style rifle and a shotgun from Joshua Stevens as payment for 1.5 ounces of methamphetamine. This fact alone persuades us that Rosario's receipt of the firearms was integral to the drug transaction.[48] In

[47] *United States v. Sparrow*, 371 F.3d 851, 853 (3d Cir. 2004) (quoting *United States v. Ceballos-Torres*, 218 F.3d 409, 414–15 (5th Cir.), *amended on reh'g in part,* 226 F.3d 651 (5th Cir. 2000)). Rosario also argues that the District Court failed to instruct the jury on the *Sparrow* factors. Because Rosario did not raise this issue before the District Court, we review it for plain error, *United States v. Dobson,* 419 F.3d 231, 236 (3d Cir. 2005). We find that even if such error occurred, it does not warrant corrective action here because it did not "seriously affect the fairness, integrity or public reputation" of the trial; rather, the evidence supported the conviction. *United States v. Olano*, 507 U.S. 725, 736 (1993) (cleaned up).

[48] *See Gardner,* 602 F.3d at 102–03 ("Whether a person who acquires a gun with drugs does so in order to obtain the gun . . . or to sell drugs, that person furthers the sale of the drugs by possessing the gun . . . but for the possession of the gun, the sale of drugs would not have occurred."); *Mahan,* 586 F.3d at 1189 ("When a defendant accepts a gun as payment for his drugs, his sale—and thus his crime—is incomplete until he receives possession of the firearm."); *see also Frederick,* 406 F.3d at 764 ("As a matter of logic, a defendant's willingness to accept possession of a gun as consideration for some drugs he wishes to sell *does* 'promote or facilitate' that illegal sale.").

addition, Stevens' friend hand-delivered them to Rosario's home; they were immediately accessible to Rosario at all times thereafter;[49] and Rosario's prior convictions prohibit him from possessing a firearm under federal law.[50] Accordingly, we will affirm Rosario's § 924(c) convictions.

## 2. Distribution of Narcotics Resulting in Death

Rosario also argues that the evidence was insufficient to support the jury's finding in Count 1 that his drug trafficking resulted in Correa's serious bodily injury in September 2018 and death in March 2019. Though he admits he previously sold drugs to Correa, he maintains that he did not distribute the drugs that caused Correa's 2018 and 2019 overdoses. Instead, he theorizes that Correa *could have* sourced drugs from his drug-rehabilitation friend group, his family, or on "the street," where he says drugs are easily accessible. Rosario adds that the packaging of the heroin found in Correa's home after his death was inconsistent with his typical heroin packaging, and that he allegedly told Correa in January 2019 that he was "done" selling narcotics.

Rosario's argument ignores key evidence tying Rosario to Correa's overdoses, including expert testimony that mixed-

---

[49] Even if the rifle had not been easily-accessible, immediate accessibility is not a requirement for a conviction. *See Sparrow*, 371 F.3d at 854 (affirming a § 924(c) conviction where officers found a firearm hidden in a compartment underneath floor tiles along with nine bags of marijuana and $140 cash).

[50] 18 U.S.C. § 922(g)(1) (prohibiting individuals convicted of a crime punishable by more than one year of imprisonment from owning or possessing firearms).

drug toxicity caused the overdoses, testimony from multiple individuals who confirmed that Rosario supplied Correa with drugs before each overdose, Trooper Bailey's testimony about his investigation leading to Rosario, and Rosario's own admission that he gave Correa a "bump" of cocaine on the night he died. Based on this evidence, the jury could have reasonably reached the finding that Rosario's drug trafficking resulted in Correa's serious bodily injury in September 2018 and his death in March 2019. We will not disturb it.

## C. Evidentiary Rulings

Rosario next questions several of the District Court's evidentiary rulings, arguing the court allowed unfavorable witness testimony that resulted in an unfair trial. He contends that the District Court improperly allowed hearsay statements from Correa's girlfriend, mother, and long-time friend, all of whom testified that Correa said he had purchased drugs from Rosario after his first overdose. The court admitted these statements as declarations against Correa's penal interest under Federal Rule of Evidence 804(b)(3).[51] For the same reason, the court granted the government's motion *in limine* to admit testimony regarding a phone call Correa made on the night he died, during which Correa said that he had met with Rosario,

---

[51] An out-of-court statement is admissible when it is contrary to the declarant's pecuniary or proprietary interest or tends to expose the declarant to civil or criminal liability, thus indicating that the declarant would not have made the statement unless he believed it to be true. Fed. R. Evid. 804(b)(3). The statement must be made by a declarant who is unavailable to testify. Fed. R. Evid. 804(a)(4).

obtained and used drugs, and was not feeling well.[52] Nothing in the record suggests error.[53]

Rosario relies on the Supreme Court's holding in *Williamson v. United States* that Rule 804(b)(3) does not permit "admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory."[54] However, *Williamson*'s holding "is not a per se rule."[55] We instead "examine the circumstances" to determine whether statements are genuinely self-inculpatory or merely self-serving.[56] We find that Correa spoke candidly to people with whom he had close, personal relationships—his girlfriend, mother, and long-time friend—to describe the aftermath of his drug purchase and use, not to avoid culpability

---

[52] Appx. 318–20; 535–36.

[53] Because Rosario did not previously object to the testimony of Correa's girlfriend, mother, and long-time friend, we review for plain error. *United States v. Flores*, 454 F.3d 149, 157 (3d Cir. 2006). We review his challenge to the motion *in limine* ruling for abuse of discretion. *See United States v. Friedman*, 658 F.3d 342, 352 (3d Cir. 2011). Neither standard affects our result.

[54] 512 U.S. 594, 600–01 (1994).

[55] *United States v. Moses*, 148 F.3d 277, 280 (3d Cir. 1998).

[56] *Id.*

or shift blame to Rosario.[57]  Rosario's arguments do not move the needle on the substantial deference we afford the District Court.  We therefore leave the court's evidentiary rulings intact.[58]

## D. Sentencing

Finally, we conduct our de novo review of Rosario's life sentence, imposed pursuant to 21 U.S.C. § 841(b)(1)(C).[59] Section 841(b)(1)(C) mandates a sentence of life imprisonment if the defendant has a prior "felony drug offense" conviction

---

[57] The Advisory Committee Notes to Rule 804(b)(3) support this view:  "[A] statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest. . . . On the other hand, the same words spoken under different circumstances, *e.g.*, to an acquaintance, would have no difficulty in qualifying."

[58] Rosario also cites testimony from three other government witnesses to exemplify the alleged prejudice he faced during trial.  None provides a basis for relief.  One witness invoked his Fifth Amendment privilege against self-incrimination when asked whether Rosario supplied him drugs; another testified that during a 2018 visit to Rosario's home, Rosario told her that he provided Xanax to a woman who the witness found asleep; and the third testified that her daughter struggled with addiction and later died.  Upon review of the testimony, we do not see how the "probative value [of the witness testimony was] substantially outweighed by the danger of . . . unfair prejudice."  Fed. R. Evid. 403.

[59] *See United States v. Henderson*, 841 F.3d 623, 626 (3d Cir. 2016) (reviewing legal challenge to mandatory minimum sentence de novo).

25

and his instant drug trafficking offense resulted in another individual's death or serious bodily injury. Rosario urges us to vacate his sentence because, in his view, § 841(b)(1)(C)'s sentencing scheme is inherently unconstitutional and inconsistent with Congressional intent, and because the District Court failed to apply the categorical approach as required to determine whether Rosario's prior state drug convictions constitute "felony drug offenses." Rosario is correct only as to his latter argument.

### 1. § 841(b)(1)(C) Statutory Interpretation and Constitutionality

Because this is our first precedential treatment of § 841(b)(1)(C)'s statutory interpretation and constitutionality, we begin with a brief recitation of the statute's evolution. The First Step Act of 2018[60] amended 21 U.S.C. § 841(b)(1)(A) and (B) to reduce sentences for defendants with prior drug convictions to a range of 20 years to life imprisonment, while the mandatory life sentence under § 841(b)(1)(C)—the pertinent subsection here—remained unchanged. Now, a defendant convicted under § 841(b)(1)(A) or (B) only faces a mandatory life sentence if both: (a) the substance distribution results in an individual's death or serious bodily injury; and (b) the defendant has a prior conviction for either a "serious drug felony" or a "serious violent felony."[61] By contrast, a conviction under § 841(b)(1)(C) mandates a life sentence where the defendant's drug distribution results in death or

---

[60] Pub. L. 115-391, § 401(a), 132 Stat. 5220–21.
[61] 21 U.S.C. § 841(b)(1)(A)–(B).

serious bodily injury and the defendant has a prior "felony drug offense" conviction.[62]

To prove a "serious drug felony," the government must show that the defendant served "more than 12 months" in prison "within 15 years . . . of the instant offense" for a drug-trafficking offense that carried 10 or more years in prison.[63] A "felony drug offense" on the other hand, is "an offense that is punishable by imprisonment for more than one year . . . that prohibits or restricts conduct relating to narcotic drugs, mari[j]uana, anabolic steroids, or depressant or stimulant substances."[64] Thus, to prove a "felony drug offense," the government need only link the instant offense to state misdemeanors or simple possession felonies.

Because the government can prove a defendant previously committed a "felony drug offense" more readily than a "serious drug felony," Rosario urges that we apply the "serious drug felony" standard and vacate his mandatory life sentence. In support of his position, Rosario raises both statutory and constitutional challenges. He first asserts that the tools of statutory interpretation demand a revision to the sentencing scheme; otherwise, he claims, the scheme produces irrational and absurd sentencing outcomes for certain recidivist drug offenders.[65] He then contends that the scheme violates the Constitution's prohibition on cruel and unusual punishment

---

[62] *Id.* at § 841(b)(1)(C).

[63] 21 U.S.C. § 802(58); 18 U.S.C. § 924(e)(2)(A).

[64] 21 U.S.C. § 802(44).

[65] Rosario points to textual and contextual tools of interpretation in addition to the rule of lenity, the doctrine of constitutional avoidance, and the canon against surplusage.

and its guarantees of equal protection and due process.[66]  But even an unfair statute is not inherently unconstitutional.

We turn first to Rosario's contention that statutory-interpretation principles require revising § 841(b)(1)(C).  They do not.  Where, as here, a statute is plain and unambiguous, no basis exists for further inquiry, let alone for applying canons of construction.[67]  Instead, our role is to "give effect to Congress's intent."[68]  Our Court did so in *United States v. Zayas*, where we recognized that the First Step Act made no revisions to § 841(b)(1)(C).[69]  There, the defendant had two prior convictions for violating New Jersey's laws against possessing a dangerous controlled substance[70] and distributing a controlled substance within 1,000 feet of a school.[71]  We found these convictions constituted "felony drug offenses" under § 802(44) because both crimes restricted conduct relating to narcotics and carried punishments of three to five years imprisonment.[72]  Thus, we affirmed the district court's imposition of the mandatory sentencing enhancement prescribed by § 841(b)(1)(C).[73]

Our decision in *Zayas* did not reach the question of § 841(b)(1)(C)'s proper interpretation.  However, we need not deconstruct the statute to build on what we already recognized

---

[66] U.S. Const. amend. VIII; *id.* at amend. V.; *id.* at amend. XIV.
[67] *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001).
[68] *Id.*
[69] 32 F.4th 211, 231 (3d Cir. 2022).
[70] N.J. Stat. Ann. § 2C:35-10(a)(1).
[71] N.J. Stat. Ann. § 2C:35-7.
[72] *Zayas*, 32 F.4th at 231.
[73] *Id.*

in *Zayas*: Congress deliberately chose not to amend it.[74] Rather, we presume that Congress meant what it said, and we are not to "soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome."[75]

Placing *Zayas* aside, we still reject Rosario's argument that absent a rewrite, § 841(b)(1)(C) is irrational or absurd. Rosario has presented no case law—from this Court or any other—to indicate that Congress intended the statute to apply differently than we currently read it. In any event, Rosario's requested remedy—that we rewrite the statute to replace its unambiguous reference to a "felony drug offense" with the term "serious drug felony"—plainly contradicts the bounds of

---

[74] *Id.* Nor do we see a reason to wade into the statutory interpretation doctrines Rosario raises. The statute is clear as-written, as is Congress's intent in enacting the statute. *See Gov't of Virgin Islands v. Knight*, 989 F.2d 619, 633 (3d Cir. 1993) ("[We] presume that Congress expressed its legislative intent through the ordinary meaning of the words it chose to use, and if the statutory language is unambiguous, the plain meaning of the words ordinarily is regarded as conclusive.").
[75] *Lamie v. United States Trustee*, 540 U.S. 526, 538 (2004); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then this first canon is also the last: judicial inquiry is complete.") (cleaned up).

our authority, as statutes are to be written by Congress, not the Judiciary.[76]

This brings us to Rosario's constitutional challenges. Rosario claims that § 841(b)(1)(C)'s "upside-down" sentencing scheme violates the Eighth Amendment's prohibition on "cruel and unusual" punishment.[77] The Supreme Court made clear in its *Harmelin v. Michigan*[78] decision that "[s]evere, mandatory penalties may be cruel, but they are not unusual in the constitutional sense."[79] Since then, our sister circuits have consistently rejected Eighth Amendment challenges to life sentences imposed under §

---

[76] U.S. Const. art. I, § 7; *see also Garland v. Cargill*, 602 U.S. 406, 428 (2024) ("[I]t is never our job to rewrite statutory text under the banner of speculation about what Congress might have done."); *United States v. Safehouse*, 985 F.3d 225, 243 (3d Cir. 2021) ("We cannot rewrite the statute. Only Congress can.").

[77] U.S. Const. amend. VIII.

[78] 501 U.S. 957 (1991) (affirming that a life sentence for a defendant's drug possession does not violate the Eighth Amendment).

[79] *Id.* at 994.

841(b)(1).[80]  Applying the same principles from *Harmelin*, as did our sister circuits, we hold that § 841(b)(1)(C)'s punishment scheme does not violate the Eighth Amendment.

To the extent Rosario believes the sentence is disproportionate to his crime, our cases effectively foreclose that argument, as we do not see how he could make the "exceedingly rare" showing that a "gross imbalance [exists] between the crime and the sentence."[81]  By his own admission, Rosario repeatedly sold illegal drugs to multiple customers, including after he was twice-convicted in state court for the same unlawful conduct.  These circumstances are neither rare nor exceptional—they mirror the cases in which we found that

---

[80] *See United States v. Kratsas*, 45 F.3d 63, 68 (4th Cir. 1995) (finding that "a mandatory sentence of life imprisonment without release, as applied to a repeat drug offender, did not run afoul of the Eighth Amendment's prohibition against cruel and unusual punishment"); *United States v. Sturmoski,* 971 F.2d 452, 462 (10th Cir. 1992) (finding that "a life sentence for a drug trafficker does not violate the Eighth Amendment"); *United States v. Collins*, 340 F.3d 672, 679–80 (8th Cir. 2003) ("[M]andatory minimum penalties for drug offenses do not violate the Eighth Amendment's prohibition of cruel and unusual punishments. . . . Furthermore, [ ] a sentence that falls within the range prescribed by statute has never been found to be an Eighth Amendment violation.").

[81] *United States v. Burnett*, 773 F.3d 122, 137 (3d Cir. 2014) (quoting *Ewing v. California*, 538 U.S. 11, 21 (2003)).  Though Rosario's Opening Brief raises an Eighth Amendment challenge, Br. at 57, the argument primarily rests on citations to the briefing below and in a nearly identical case, *United States v. Robert Jackson*, No. 3:20-cr-290.

the statutory punishment fit the crime.[82]  Thus, § 841(b)(1)(C) does not constitute cruel and unusual punishment on its face, or as applied to Rosario.

Rosario further argues that the statute runs afoul of the Fifth Amendment, but we are not persuaded.  Using the rational basis framework,[83] we examine whether the enhanced penalty imposed on recidivist drug trafficking defendants "rationally furthers a legitimate [government] interest."[84]  The United States Court of Appeals for the Eighth Circuit squarely addressed this issue in *United States v. Cardwell*,[85] holding that Congress has a legitimate interest in punishing "street-level drug traffickers" more harshly when their direct sales of small quantity drugs result in an individual's death, and Congress's decision to exclude such drug traffickers from the First Step Act's sentencing reforms indicates its intent for such punishment.[86]  We hold now, as the Eighth Circuit held, that

---

[82] *See, e.g.*, *United States v. Walker*, 473 F.3d 71, 83 (3d Cir. 2007) (finding the gravity of the defendant's repeated drug trafficking and armed robbery crimes did not outweigh the harshness of his mandatory 55-year consecutive sentence).

[83] We apply a rational basis review to Rosario's equal protection challenge because drug offenders are not a suspect class, and Rosario has not identified any fundamental right that § 841(b)(1)(C) affects.

[84] *United States v. Pollard*, 326 F.3d 397, 407 (3d Cir. 2003).

[85] 71 F.4th 1122, 1135 (8th Cir. 2023).

[86] *Id.* (quoting *United States v. Hixon*, No. CR 5:18-145-DCR, 2019 WL 6617398, at *5 (E.D. Ky. Dec. 5, 2019), *aff'd*, 838 F. App'x 961 (6th Cir. 2020)).

section 841(b)(1)(C) "was constitutional before, nothing has changed, and it remains constitutional today."[87]

## 2. The Categorical Approach

Rosario alternatively argues—and we agree—that the District Court erred by declining to apply what we refer to as the traditional categorical approach set forth in *Taylor v. United States*.[88] Under this approach, Rosario contends his prior convictions do not qualify as felony drug offenses as defined under § 802(44) because Pennsylvania's statutes criminalize a broader category of drugs than those included in the federal definition. As Rosario's challenge presents a pure question of law, our review is plenary.[89]

The categorical approach outlined in *Taylor* requires that we compare the elements of the statute forming the basis of Rosario's predicate offense with the elements of the generic crime, "*i.e.*, the offense as commonly understood."[90] In doing so, we look only to the elements of the statutes of conviction, and not to any facts underlying those convictions.[91] A conviction qualifies as a predicate offense "only if the statute's elements are the same as, or narrower than, those of the generic offense."[92]

---

[87] *Id.*

[88] 495 U.S. 575 (1990).

[89] *Henderson*, 841 F.3d at 626.

[90] *Id.* at 627 (quoting *Descamps v. United States*, 570 U.S. 254, 257 (2013)).

[91] *Id.*

[92] *Id.* (quoting *Descamps*, 570 U.S. at 257) (emphasis omitted).

The District Court reached its sentence using a conduct-based methodology, which we refer to as the "looser" categorical approach. Under this approach, instead of precisely matching the state offense elements and the federal generic offense, a court need only determine whether a "logical or causal connection" exists between the statutory provisions: Do they "target the same, core criminal conduct such that they are 'directly analogous.'"[93]

As we noted above,[94] a "felony drug offense" considers an offense that "prohibits or restricts" a defendant's "*conduct relating to* narcotic drugs, mari[j]uana, anabolic steroids, or depressant or stimulant substances."[95] Because the District Court viewed § 841(b)(1)(C) to be "defined by reference to certain conduct relating to 'narcotics'" instead of by "reference to the Controlled Substances Act or any other federal criminal statute," the District Court reasoned that this "looser" approach applied.[96] It did so in error.

Our precedent in *United States v. Aviles* steers our conclusion that the traditional categorical approach applies to sentences under § 841(b)(1)(C).[97] There, we recognized that the traditional categorical approach is the default method used to analyze whether a defendant's state conviction qualifies as

---

[93] *United States v. Portanova*, 961 F.3d 252, 258 (3d Cir. 2020) (quoting *Williams v. Att'y Gen. U.S.*, 880 F.3d 100, 105 (3d Cir. 2018)).
[94] *See supra* Part II(D)(1).
[95] 21 U.S.C. § 802(44) (emphasis added).
[96] Appx. 891–92.
[97] 938 F.3d 503 (3d Cir. 2019).

a felony drug offense.[98]  The government recognizes as much, but counters that the District Court justifiably applied the "looser" categorical approach because it reads § 841(b)(1)(C) as predicated on a defendant's conduct rather than his conviction.

After *Aviles*, we clarified in *United States v. Perez-Colon* that the "looser" categorical approach applies where the applicable sentencing statute focuses on whether the defendant engaged in certain *conduct*, while the traditional categorical approach applies where the focus is whether the defendant had certain *convictions*.[99]  In so holding, we noted that "a sentencing enhancement's use of the phrase 'conviction' indicates Congress's intent to apply the categorical approach."[100]

Today, we find that a plain reading of § 841(b)(1)(C) makes clear that its sentencing enhancement is predicated on a defendant's conviction—not his conduct.  The mandatory life imprisonment sentence triggers only once a defendant commits a federal crime after receiving a "prior *conviction* for a felony

---

[98] *Id.* at 511.

[99] 62 F.4th 805, 815 (3d Cir. 2023).  *Compare id.* (noting the categorical approach did not apply to Guideline § 4B1.5(b)'s enhancement for defendants who "engaged in a pattern of activity involving prohibited sexual *conduct*") (emphasis added), *with United States v. Dahl*, 833 F.3d 345, 349 (3d Cir. 2016) (applying the categorical approach to Guideline § 4B1.5(a)'s enhancement, which is triggered by a defendant's prior "sex offense *conviction*").

[100] *Perez-Colon*, 62 F.4th at 815 (quoting *Dahl*, 833 F.3d at 350).

drug offense."[101]  Thus, consistent with *Aviles* and *Perez-Colon*, the District Court's task was to review the elements of the Pennsylvania statutes forming the basis of Rosario's two prior drug convictions and assess whether they "prohibit or restrict" conduct relating to the substances listed in § 802(44), not to assume that the "looser" categorical approach applied merely because Rosario's conduct may have involved one of those listed substances.[102]

An analogous case decided by the United States Court of Appeals for the Seventh Circuit, *United States v. Elder*,[103] further guides our holding that the traditional categorical approach applies to § 841(b)(1)(C).  The defendant in *Elder* was convicted of conspiring to distribute methamphetamine in violation of federal law and, like Rosario, had two prior state drug convictions.[104]  Finding the state convictions qualified as felony drug offenses under the "looser" categorical approach, the district court sentenced the defendant under § 841(b)(1)(A), which, prior to the First Step Act's amendments, prescribed an enhanced sentence when the defendant has a prior felony drug offense conviction.[105]

The Seventh Circuit precedentially adopted the *Taylor* categorical approach for § 841 sentence enhancements[106] and

---

[101] 21 U.S.C. § 841(b)(1)(C) (emphasis added).

[102] Rosario separately argues that the substances underlying his prior convictions—cocaine and heroin—are not a categorical match for the substances listed in § 802(44).  We do not reach this issue here.

[103] 900 F.3d 491, 493–94 (7th Cir. 2018).

[104] *Id.* at 494.

[105] *Id.* at 496–97.

[106] *Id.* at 501, 504.

required resentencing consistent with that approach. In support of its conclusion, it explained that the "three factors historically relied on by the Supreme Court to justify the categorical approach support[ed] its application to § 841(b)(1)(A) and § 802(44):"[107] (1) the text of the recidivist statute; (2) the Sixth Amendment concerns of usurping a jury's factfinding role when using the conduct-specific approach; and (3) the general practical and fairness considerations to the defendant.[108] As these factors underscore our holding, we discuss each in turn.

*First*, as the Seventh Circuit explained, the text and structure of the federal recidivist statutes—applying to defendants with a prior felony drug offense *conviction*—confirms Congress's intent to tie enhanced penalties to the *elements* of a prior offense rather than its underlying *conduct*.[109]

*Second*, *Elder* emphasized concerns that arise under the Sixth Amendment when courts look beyond the elements of a defendant's prior conviction.[110] Because any fact that increases a mandatory minimum must be found beyond a reasonable doubt by a jury,[111] limiting the inquiry to the elements of the defendant's prior offense avoids the very

---

[107] *Id.* at 501; *see also Mathis v. United States*, 579 U.S. 500, 510–12 (2016).
[108] *Mathis*, 579 U.S. at 510–12; *Elder*, 900 F.3d at 498.
[109] *Elder*, 900 F.3d at 499; *see also Taylor*, 495 U.S. at 600–01.
[110] *Elder*, 900 F.3d at 499.
[111] *Alleyne v. United States*, 570 U.S. 99, 103 (2013).

constitutional problems the Supreme Court "repeatedly has warned" against.[112]

*Third*, the Seventh Circuit correctly recognized that the categorical approach promotes fairness to defendants.[113] The Supreme Court explained in *Mathis* that facts beyond a crime's elements are "prone to error" because they need not be proven for conviction.[114] By focusing only on the elements of an offense, courts avoid the risk that any uncorrected factual errors in a defendant's record of prior conviction will, at some later point, "trigger[ ] a lengthy mandatory sentence."[115]

Taken together, these considerations reinforce the Seventh Circuit's conclusion in *Elder*, and we adopt its reasoning as applied to § 841(b)(1)(C). We end our analysis here. The District Court should have applied the traditional categorical approach consistent with *Taylor* and *Aviles*. We will remand for it to do so.

## E. CONCLUSION

For the foregoing reasons, we affirm in part and reverse in part. We affirm Rosario's judgments of conviction, but vacate Rosario's sentence and remand for resentencing proceedings consistent with this opinion.

---

[112] *Elder*, 900 F.3d at 500 (citing *Descamps*, 570 U.S. at 269).
[113] *Id.*
[114] *Mathis*, 579 U.S. at 512.
[115] *Id.*